IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **LIGHTING RETROFIT INTERNATIONAL, LLC** | * * * * | |
| Plaintiff/Counter-Defendant, | * * | |
| v. | * * | Civil Case No. 19-cv-02751-SAG |
| **CONSTELLATION NEWENERGY, INC.,** *et al.* | * * * | |
| Defendant/Counter-Plaintiff. | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Lighting Retrofit International, LLC ("Plaintiff" or "LRI") was subcontracted by Defendant Constellation NewEnergy, Inc. ("Defendant or "Constellation") to provide lighting and plumbing system upgrades for the Federal Bureau of Prisons ("BOP") at the Coleman Federal Correctional Complex ("FCC Coleman") in Coleman, Florida. LRI has sued Constellation for various claims related to Constellation's alleged breach of the parties' subcontract. ECF 1. In addition to disclaiming its liability to LRI, Constellation has countersued, alleging that LRI breached the subcontract. ECF 53. The parties' plumbing-related claims have been stayed. ECF 49. With respect to the lighting-related claims, however, Constellation has filed a motion for summary judgment on LRI's claims and on Constellation's own counterclaim. ECF 66. Liberty Mutual, Constellation's surety, has also filed a motion for summary judgment on Counts I and II of LRI's Complaint. ECF 65. LRI has opposed the motions, ECF 77, and Constellation and Liberty Mutual have filed replies. ECF 84, 85. This Court has reviewed these filings and the exhibits attached to them. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the

reasons set forth below, Constellation's motion will be granted in part and denied in part, and Liberty Mutual's motion will be denied.

I.  FACTUAL BACKGROUND

The following facts are construed in the light most favorable to LRI, as the non-moving party.

In mid-2012 through early 2013, Constellation began pursuing an opportunity to serve as the contractor on an energy savings performance contract for the BOP. ECF 64 ¶ 1 (Stipulation of Facts). The contract involved several energy conservation measures ("ECMs") at FCC Coleman. *Id.* The two ECMs relevant here are ECM-1, which involved various upgrades to the interior and exterior lighting systems designed to lower electricity costs, and ECM-2, which involved similar plumbing upgrades. *Id.* ¶ 2.

As Constellation pursued the opportunity, it began to identify potential subcontractors. *Id.* ¶ 3. Constellation performed an initial audit of the prison complex to determine "the number and types of lamps, ballasts, and lighting fixtures that would need to be replaced[,]" ECF 66-1 at 14, and it sent instructions to potential subcontractors regarding ECM-1. ECF 64 ¶ 4. Those instructions listed the "Global Tech Solstice GTSOL5498-4X LED" retrofit kits among the fixtures for which prospective subcontractors were to provide pricing. *Id.* ¶ 6. These retrofit kits were manufactured by Global Tech LED, LLC ("Global Tech"), and they were to be used in the "high mast" light fixtures for exterior lights at FCC Coleman that are mounted on poles approximately either 100 or 87 feet tall. *Id.* ¶¶ 5-6.

After circulating the bid packages, Constellation allowed prospective subcontractors to submit written questions, and Constellation provided written answers. *Id.* ¶ 10. One question submitted asked whether subcontractors could provide pricing for alternative parts and fixtures,

other than those listed in the bid package. ECF 66-13. Constellation initially responded that pricing needed to be based "on specified equipment only[,]" but it later changed its response to allow potential subcontractors to provide pricing on specified "or equal" (*i.e.* alternative) products. ECF 66-17. Notably, LRI argues that this permission was illusory because "there were no other retrofit kits on the market." ECF 77-1 at 3.

In April or May, 2013, Constellation told LRI that it wanted to begin negotiations with LRI with the hope of reaching a subcontract agreement. ECF 64 ¶ 11. During the negotiation period, LRI participated in an "Investment Grade Audit" ("IGA") at the FCC Coleman site, which involved several site visits. ECF 66-1 at 17; ECF 64 ¶ 12. According to Constellation, the purpose of the audit process "was to allow Constellation and LRI to observe the facilities, evaluate the operating environment, and develop a comprehensive design concerning the fixtures, systems, components, and upgrades that would be implemented in order to achieve the desired energy savings in relation to the prison lighting system." ECF 66-1 at 18. According to LRI, however, the IGA process "was nothing more than a counting exercise to match up the products that [Constellation] had specified with the quantities that would be required." ECF 77-1 at 4.

As part of the IGA process, LRI apparently spoke with Global Tech to determine the pricing for the retrofit kits that were to be used for the project. ECF 77-1 at 4. Global Tech allegedly made unusual demands for up front payments from LRI. *Id.* These demands caused LRI to be concerned about Global Tech's financial status, and LRI communicated these concerns to Constellation, along with its more general concerns about Global Tech's "lack of time in the industry." *Id.* LRI also argues that it proposed several alternative non-retrofit options during the pre-contract phase, all of which Constellation rejected in favor of the less-expensive Global Tech retrofit kits. *Id.*

3

On or about December 9, 2014, LRI and Constellation executed a subcontract for the FCC Coleman project (the "Subcontract"). ECF 66-1 at 19. Subsection 6.8 of the Subcontract contains the following warranty provisions:

> 6.8    *Warranties.*  Subcontractor warrants that (a) all services will be provided by qualified, competent and professional persons in a timely, good and workmanlike manner and with a degree of skill and care in conformity with industry standards, (b) all equipment will be free from defects and installed in accordance with manufacturer's specifications, and (c) all services and equipment shall be in compliance with all applicable laws, licenses, and permits. Subcontractor will obtain vendor/manufacturer/supplier warranties and pass through all such warranties to both Constellation and Constellation's Customers. Subcontractor shall, if available, with the prior written approval of Constellation, obtain extended warranties, and pass through all such extended warranties to both Constellation and Constellation's Customers. The Subcontractor shall, at its sole expense interface, and act as liaison with Subcontractor-purchased materials manufacturers, vendors, and suppliers to resolve problems and pursue warranty claims on behalf of Constellation and Constellation's Customers. In the event a manufacturer, vendor, or supplier of such materials ceases operations or is otherwise unable to meet its warranty obligations to Constellation or Constellation's Customers, Subcontractor agrees to provide or secure, at its sole expense, for Constellation and Constellation's Customers, all such warranties including but not limited to any required spare parts.
>
> The warranties set forth herein shall continue for a period of one (1) year after the date of Constellation's final acceptance of the work or Customer's beneficial use, whichever is later, unless a longer period is set forth in the Contract Documents. Unless otherwise provided on the Scope of Work, if the services and materials provided by Subcontractor hereunder do not conform to the warranties included herein, then Subcontractor will (at its sole cost and expense) do any of the following upon Constellation's request: (a) re-perform the services, or repair or replace the equipment, in a satisfactory manner that conforms to the terms of this Subcontract, (b) pay Constellation any money damages that Constellation owes as a result of nonconformance and refund the portion of the cost hereunder which is attributable to such nonconformance, (c) if Constellation chooses to correct the breach by re-performing the services or repairing or replacing the equipment, (by itself or through another subcontractor), pay Constellation any expenses Constellation incurs itself or pays a third party. This warranty shall not in any way limit any standard warranties provided by Subcontractor to its customers generally.

ECF 66-19.

On March 24, 2015, LRI and Constellation executed a scope of work (the "SOW"). ECF 66-20. The SOW provided that LRI would provide "final design and all labor, materials, material

4

coordination, permits, shipping cost, storage cost, trash disposal taxes, tools, specialized equipment and full-time onsite supervision necessary to implement a full functional project." *Id.* The SOW also specified that Global Tech's Solstice retrofit kits would be used in the project. *Id.*

The following day, LRI executed a purchase order with Global Tech for the Solstice retrofit kits to be used in the ECM-1 phase of the project. ECF 64 ¶ 17; ECF 66-22 (Purchase Order). The purchase order also included a $50,000 extended warranty. ECF 64 ¶ 17; ECF 66-22.

LRI began installing the Global Tech high mast retrofit kits at FCC Coleman in 2015. ECF 64 ¶ 18. In August, 2015, the high mast retrofit LED lights began failing at a greater than expected rate. *Id.* ¶ 19. An investigation revealed that the cause of these failures was likely heat related. *Id.* ¶ 20. According to LRI, as the retrofits started to fail, "they were sent back to Global Tech during the time when Global Tech was providing replacements." ECF 77-1 at 5.

Over time, it was determined that the "drivers" were the cause of the problems. *Id.* at 6. LRI argues that "BOP contributed to the driver failures by running the highmast lighting 24 hours a day, despite them being designed to run dusk to dawn so that they were not operating in the daytime Florida heat." *Id.* Nonetheless, LRI states that Global Tech would supply it with new drivers to install, and that it replaced 942 drivers in total through June, 2018 (although some drivers never actually failed). *Id.* According to LRI, "once the replacement drivers were installed, the remaining components . . . began functioning again." *Id.* Even after Global Tech stopped supplying replacement drivers, LRI states that it sourced them from another supplier. *Id.* However, "[e]ventually[] LRI refused to continue supplying drivers because it had become clear that BOP was using them as a free maintenance arm and refusing to sign off on completion [of the project] in bad faith." *Id.* LRI states that it incurred $465,620 in high mast repair costs between 2015-2019. *Id.*

After Global Tech eventually failed to honor the extended warranty LRI had purchased from it, LRI sued Global Tech in Florida state court in January, 2017. *Id.* ¶¶ 21-22. In 2018, Global Tech became insolvent, its counsel in the state court action withdrew, it failed to retain new counsel, and LRI did not collect any money from Global Tech as a result of the suit. *Id.* ¶ 23.

Because of the problems with the Global Tech high mast retrofit LED lights, all previously installed Global Tech retrofit kits were removed. ECF 66-1 at 22. According to Constellation, LRI refused to participate in this process, and Constellation hired third party Aelux LLC ("Aelux") in 2019 to replace the high mast lighting fixtures with a new lighting product. *Id.* Constellation states that the cost of the original SOW between Constellation and Aelux was $1,275,517.00. *Id.* at 23.

Constellation also argues that BOP inspected the interior lighting work that LRI performed. *Id.* BOP apparently compared the "line-by-line record of the work" LRI completed (known as an "as-built") "against the actual work performed by LRI." *Id.* BOP identified locations where, according to it, lighting products were not installed as LRI stated they had been in the as-built. *Id.* BOP apparently stated that it would not sign off on the completion of the ECM-1 phase of the project unless and until this work was completed. *Id.* LRI strongly contests these assertions and states that it completed its SOW and that the interior lighting work that Constellation and the BOP claim it neglected was not actually within its SOW. ECF 77-1 at 10-11.

Constellation and Aelux allegedly negotiated with the BOP and agreed on a "final count on missing product." ECF 66-1 at 23. Constellation and Aelux then executed a change order to expand Aelux's SOW beyond the exterior lighting work it had initially agreed to provide. *Id.* Constellation argues that it incurred significant costs as a result of LRI's failures because it was forced to pay Aelux to replace the high mast lighting retrofit kits and to finish part of LRI's interior

lighting work. *Id.* Constellation also argues that it incurred costs to provide "emergency lighting" at FCC Coleman at various times between 2016 and 2019, until Aelux installed the new high mast lights. *Id.*

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine

issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  ANALYSIS

Constellation has moved for summary judgment on its own counterclaim as well as all of LRI's claims. There are several contractual disputes at issue in this case. First, LRI claims that Constellation breached the Subcontract by failing to pay a substantial portion of the money it owed LRI. This dispute forms the basis for LRI's Complaint. Likely because LRI has not moved for summary judgment, the parties' briefing almost entirely ignores this dispute. Second, Constellation argues that LRI breached the Subcontract's warranty provisions by refusing to continue to replace the failing retrofit kits, and by failing to reimburse Constellation for the cost of paying Aelux to replace the exterior high mast lighting. And third, Constellation claims that LRI breached the Subcontract by failing to complete interior lighting work that was set forth in LRI's SOW. The second and third of these disputes form the basis for Constellation's Counterclaim. This Court will address Constellation's counterclaim, and each of LRI's claims, in turn.

### a. Constellation's Breach of Contract Counterclaim

Constellation's counterclaim alleges that LRI breached the Subcontract by failing to honor its warranty obligations and by failing to complete the interior lighting work it agreed to perform

in the SOW. This Court will address the issues related to the exterior high mast lighting before turning to the interior lighting. The Court ultimately finds, however, that factual disputes require the denial of Constellation's motion.

### i. Exterior High Mast Lighting

#### 1. The *Spearin* Doctrine

LRI primarily relies on the *Spearin* doctrine to argue that the Subcontract's warranty provisions are invalid and should not be enforced. In *United States v. Spearin*, the Supreme Court held that when a "contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specification." 248 U.S. 132, 136 (1918) (citations omitted). *Spearin* and its progeny set forth a default rule of fundamental fairness that when a general contractor requires a subcontractor to follow certain plans and specifications, the general contractor impliedly warrants that those plans and specifications are "free from design defects." *White v. Edsall Const. Co., Inc.*, 296 F.3d 1081, 1084 (Fed. Cir. 2002). Put simply, *Spearin* protects subcontractors from liability for simply following the general contractor's directions and requirements.

However, the implied warranty set forth in *Spearin* and its progeny may be overcome by express agreement. *See id.* ("express and specific disclaimers suffice to overcome the implied warranty that accompanies design specifications."). Where a general contractor and subcontractor expressly agree to allocate the risk of a defective product to the subcontractor, that express agreement must prevail over *Spearin*'s implied warranty. As support for this proposition, Constellation relies on *Rhone Poulenc Rorer Pharmaceuticals Inc. v. Newman Glass Works*, 112 F.3d 695 (3d Cir. 1997). *Rhone Poulenc* involved several subcontracts related to the installation of opaque spandrel glass. *Id.* at 696. The subcontracts required that the subcontractor, Newman

Glass Works ("Newman"), would "remove and . . . replace all materials that Plaintiff or its architect 'condemn as unsound, defective or improper.'" *Id.* at 696-97.  Moreover, Newman expressly warranted that "all work will be 'free from faults and defects.'" *Id.* at 697.

The glass turned out to be defective, and litigation ensued.  After prevailing at trial, Newman argued on appeal that, under *Spearin*, it could not "be held liable for any defects in the glass because it complied with the specifications in the subcontracts." *Id.*  The Third Circuit disagreed.  It explained that although *Spearin* "normally would absolve [Newman] of liability for the defective glass, we are presented here with a conflict between the implied and the express warranties." *Id.*  It continued, explaining that "[t]his warrant of specification permits a court to allocate the risk of an inadequate specification, quite equitably, to the party that drafted the specification.  Here, though, the parties have explicitly allocated to Defendant the risk that the glass would be defective.  The parties are free to do so, and there is no indication of overreaching or bad faith[.]" *Id.*  While the court acknowledged that "Newman had virtually no discretion in carrying out its contractual obligations in light of the exacting specifications in the subcontracts[,]" it ultimately held that "the implied warranty . . . based on the specifications of the type and manufacturer of the spandrel glass must yield to [Newman's] express warranties against defective materials." *Id.* at 698.

Constellation cites several other cases that enforce parties' express contractual agreement over the *Spearin* implied warranty.  *Greenbriar Digging Service Ltd. P'ship v. South Central Water Association, Inc.*, No. 3:07CV601, 2009 WL 812241, at *3-4 (S.D. Miss. Mar. 26, 2009); *Aquatrol Corp. v. Altoona City Authority*, 296 F. App'x 221, 225 n.3 (3d Cir. 2008); *Graham Const. Co., Inc. v. Earl*, 362 Ark. 220, 228, 231 (2005); *Greater Richmond Civic Recreation, Inc. v. A.H. Ewing's Sons, Inc.*, 200 Va. 593, 597 (1959).  Although none of the cases on which LRI

relies involves a conflict between the *Spearin* implied warranty and an express agreement between the parties,[1] Constellation acknowledges one case in which a court relied on *Spearin* to absolve a subcontractor of liability despite the parties' express agreement allocating risk to the subcontractor. *Travelers Indem. Co. v. S.M. Wilson & Co.*, No. 4:04 CV 01365, 2005 WL 2234582 (E.D. Mo. Sept. 14, 2005). In that case, applying Missouri law, the court found that "Missouri courts generally take the view that contractors should not be held liable for circumstances which are beyond their control." *Id.* at *10.

At the outset, this situation was not beyond LRI's control. It was, of course, beyond LRI's control that the Global Tech retrofit kits were ultimately problematic, but even assuming Constellation forced LRI to use that particular product, LRI freely and willingly agreed to the unequivocal warranty provisions in the Subcontract—a conscious choice that was, undoubtedly, within LRI's control.

Regardless, this Court cannot reach the *S.M. Wilson* court's conclusion under Maryland law. While neither party cites a case (and this Court has not found one) that applies Maryland law to a situation in which a party relies on the *Spearin* doctrine in the face of an express allocation of risk to it, Maryland law is clear that expressly stated contractual agreements must be enforced. *See Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020) (under Maryland law,

---

[1] The only two that come close are *White*, 296 F.3d at 1081, and *St. Joseph Hospital v. Corbetta Const. Co. Inc.*, 316 N.E.2d 51 (Ill. App. 1974). *See* ECF 77-1 at 26 (citing these two cases for the proposition that "the existence of an express warranty or indemnity does not allow CNE to circumvent the implied warranty under *Spearin*."). However, those cases involved a conflict between very general disclaimers and guarantees and the implied warranty under *Spearin*. In fact, the *White* case specifically acknowledged that "express and specific disclaimers suffice to overcome the implied warranty[.]" *White*, 296 F.3d at 1085. Those cases are, therefore, distinguishable from the cases on which Constellation relies, and the situation here, where the parties expressly agreed that LRI, not Constellation, would bear the risk that the Global Tech retrofit kits would not function properly.

"it is improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.") (citing *Calomiris v. Woods*, 353 Md. 425, 727 A.2d 358, 368 (1999)). Therefore, an implied warranty that exists to prevent a general contractor from unfairly taking advantage of a subcontractor for merely following the general contractor's directions must yield where a sophisticated subcontractor expressly agrees to shoulder the risk.

LRI vaguely attempts to analogize this case to a situation in which one party demands that the other party indemnify it for its own negligence. *See* ECF 77-1 at 17 (citing *St. Joseph Hospital*); ECF 77-1 at 20 ("LRI does not have any obligation to indemnify [Constellation] for defects in CNE's own plans."). While an imperfect analogy, it is true that Maryland law looks skeptically upon contractual agreements to indemnify a party against its own negligence. *See Farrell Lines, Inc. v. Devlin*, 211 Md. 404, 421 (1956); *Board of Trustees, Community College of Baltimore County v. Patient First Corp.*, 444 Md. 452, 465 (2015). But even those agreements are not categorically unenforceable; indeed, they may be enforced if "such a construction is required by clear and explicit language[.]" *Farrell Lines, Inc.*, 211 Md. at 421; *Patient First Corp.*, 444 Md. at 465 (such agreements are enforceable if they are "expressed in those very words or in other unequivocal terms.").

Here, LRI clearly and unequivocally agreed to bear a portion of the risk that the retrofit kits would fail. Notably, it did not agree to bear *all* of that risk—the warranty provisions have specified time limits—but it clearly agreed to stand behind the Global Tech retrofit kits as the warranty provisions require. If, at the time, LRI was as concerned about using the Global Tech retrofit kits as it now says it was, and if LRI was simply forced by Constellation and the BOP to use them in spite of LRI's better judgment, then it was remarkably misguided for LRI to agree to

12

the warranty provisions in the Subcontract. But it did, and there is no indication that LRI's choice was anything other than a free, informed decision by a sophisticated commercial party. LRI may now regret that choice, but it may not escape those express warranty provisions by relying on the implied warranty set forth in *Spearin* and its progeny.

### 2. LRI's Warranty Obligations

Notwithstanding the enforceability of the Subcontract's warranty provisions, there are several factual disputes that compel the denial of Constellation's motion. As an initial matter, there is a factual dispute as to whether LRI completed the work it was required to perform under the Subcontract, or whether LRI essentially quit before its work was complete. This dispute seems to turn on whether LRI had outstanding warranty obligations at the time it admittedly refused to continue working on the project in the spring of 2019. Constellation argues that LRI breached the Subcontract's warranty provisions by refusing to continue replacing the failing drivers, and by refusing to reimburse Constellation for the work Aelux did to replace the high mast lighting systems. As a result, Constellation argues it was forced "at its own expense, to provide the replacement equipment (new high mast lights) that, under the Subcontract Documents, were to have been provided by LRI 'at its sole expense.'" ECF 66-1 at 30. LRI acknowledges that, at some point in the spring of 2019, it stopped replacing drivers "because it had become clear that BOP was using [it] as a free maintenance arm and refusing to sign off on completion in bad faith." ECF 77-1 at 6. However, LRI argues that it had long since completed the work it agreed to perform. *Id.* at 8. According to LRI, Constellation acknowledged that LRI had completed its work, *see id.*, and took the position that the BOP had received beneficial use of its work, *id.*, but the BOP refused to provide final acceptance of LRI's work in bad faith. *Id.* at 26. Notably, the BOP had issued "beneficial use certificates" for LRI's high mast lighting work (although, as

Constellation points out, acknowledging beneficial use is not the same as providing final acceptance). ECF 77-1 at 7; ECF 78-21 at 16-22 (beneficial use certificates). Constellation responds that the drivers began failing before LRI says the BOP, and then Constellation, should have provided final acceptance and that LRI was continuing to work on its warranty obligations through 2019. ECF 85 at 19-20.

If LRI is right, under the terms of the warranty provisions, its obligations may have expired at some point, thus relieving it of any obligation to pay some or all of the damages Constellation seeks. And while this Court is sensitive to Constellation's argument that that the BOP was not under any obligation to provide final acceptance as the drivers were failing, this Court does not have enough information at this point about the particulars of how, why, and when the drivers were failing, their functionality after LRI would replace them, or the motivations of Constellation and the BOP, to make a factual finding on whether (and, if so, when) Constellation and the BOP should have provided final acceptance.

Finally, whether or not it is a factual dispute, this Court will note that it is not at all clear that LRI would be liable for the work Aelux did even if it was subject to the warranty provisions in the Subcontract when Aelux replaced the lighting systems at FCC Coleman. As Constellation explains, in the fall of 2019, Constellation hired Aelux to "replace the existing Coleman campus high mast lighting fixtures with [a] new, high efficiency luminaire product" at a price of $1,275,517. ECF 66-1 at 22-23. The warranty provisions, if triggered, require LRI to:

> (a) re-perform the services, or repair or replace the equipment, in a satisfactory manner that conforms to the terms of this Subcontract, (b) pay Constellation any money damages that Constellation owes as a result of nonconformance and refund the portion of the cost hereunder which is attributable to such nonconformance, (c) if Constellation chooses to correct the breach by re-performing the services or repairing or replacing the equipment, (by itself or through another subcontractor), pay Constellation any expenses Constellation incurs itself or pays a third party.

ECF 66-19. None of those provisions appears to require LRI to reimburse Constellation for the cost of replacing the entire high mast lighting system with a completely new product. Because LRI has not moved for summary judgment, this Court will not rule on this issue at this stage. While Constellation may, therefore, continue to advance its argument that Aelux's work falls within the scope of the warranty provisions, its motion for summary judgment on that issue will be denied.

### ii. Interior Lighting

There is clearly a factual dispute with respect to LRI's interior lighting work. Constellation argues that LRI failed to complete the interior lighting work in the SOW and that LRI's 2019 "as built" document (a document purporting to show the work LRI completed) included work that LRI, in fact, did not complete. ECF 66-1 at 30-31; ECF 66-3 (Benham Declaration). Accordingly, Constellation argues it was required to pay Aelux $191,225.68 to perform work that should have been done by LRI.

LRI argues, however, that Aelux's scope of work included "work in buildings that were not in LRI's scope and which were the responsibility of *other contractors*." ECF 77-1 at 27 (emphasis in original). LRI also argues that several of the items listed in Constellation's Exhibit 26, on which Constellation relies to show that LRI did not complete the work in its SOW, erroneously attributes incomplete work to LRI. ECF 77-1 at 28. Constellation does not address LRI's argument, or the discrepancies LRI highlights, in its reply. These competing claims, supported by LRI's documentary evidence that appears to undermine Constellation's argument, clearly create a dispute of material fact. Constellation's motion will, therefore, be denied with respect to LRI's interior lighting work.

### b. LRI's Miller Act and Breach of Contract Claims (Counts I-II)

LRI's Miller Act and breach of contract claims are predicated on its argument that Constellation failed to pay LRI money it was rightfully owed under the Subcontract. According to LRI, "[t]he final payment of contract work and retainage was due 'upon acceptance' of the work by CNE and BOP. Despite BOP issuing beneficial use certificates, CNE acknowledging that the work was complete, and CNE paying *more than 95% of the total contract price*, CNE refuses to formally 'accept' the work and pay the remaining 5% and retainage." ECF 77-1 at 30. Constellation, on the other hand, argues that because LRI failed to honor its warranty obligations and failed to complete its SOW, it is entitled to summary judgment on LRI's affirmative claims. But this argument is circular, and the factual disputes identified above also preclude Constellation's motion for summary judgment on LRI's affirmative claims.

Separately, although the parties do not directly address it, there is an implicit factual dispute regarding the timing of the parties' alleged breaches. For example, Constellation argues it was justified in withholding payment to LRI because LRI had not honored its warranty obligations or completed its work. ECF 66-1 at 31-34. Conversely, LRI argues it stopped working on the project because it did not want to continue to be "on the hook as an unpaid maintenance arm" for Constellation and the BOP. ECF 77-1 at 30. If LRI walked off the job before it completed its work (either under the SOW or its warranty obligations), then Constellation may have been justified in withholding the payment LRI claims Constellation owes it. However, if LRI completed its work under the SOW, and its warranty obligations had either expired or Constellation and the BOP simply made the choice to move on and start over with Aelux, then Constellation may not have had a justifiable basis to withhold payment and LRI may have had a right to refuse any additional work on the project. Either way, on the information in the record at this point, a

16

reasonable jury could plausibly find in LRI's favor on its breach of contract and Miller Act claims, and full factual development is required in order to rule for one side or the other.

### c. Prompt Payment Act (Count III)

Count III cites the Prompt Payment Act ("PPA"), 31 U.S.C. § 3901, *et seq.*, as the basis for LRI's claim. ECF 1 at 6. Relying on a slew of cases, Constellation argues that the PPA does not create a private right of action and, therefore, that it is entitled to summary judgment on Count III. ECF 66-1 at 34-35. Undeterred, LRI argues that Count III should not be construed as a claim under the PPA but, rather, as a breach of contract claim. ECF 77-1 at 31-33. According to LRI, the Subcontract is subject to the requirements set forth in the PPA and, therefore, those requirements are implicitly incorporated into the Subcontract. *Id.* LRI argues, then, that Count III should be construed as a claim that Constellation breached *the terms of the Subcontract* by violating the PPA's requirements, rather than as a direct effort to enforce the PPA itself. *Id.*

This Court is not persuaded by LRI's proposed distinction. In reality, LRI's distinction is not a distinction at all but merely a semantic effort to avoid the result this Court is compelled to reach. In a case like this one, there is no practical difference between bringing a direct claim under the PPA and alleging that a party breached contractual terms that are implicitly incorporated into a contract because that contract is subject to the PPA. While the claims might have different names, they are doing the same thing—trying to enforce the substantive provisions of the PPA. And as Constellation argues, courts have repeatedly held that the PPA does not confer a private right of action on subcontractors in government contracts. *Greenbridge Construction, Inc. v. Glasgow Investigative Solutions, Inc.*, No. CCB-20-2070, 2021 WL 1060290, at *3 (D. Md. Mar. 18, 2021) (citing *United States v. Hartford Accident & Indemnity Co.*, 168 F. Supp. 3d 824, 836 n.19 (D. Md. 2016); *see also United States v. Tyler Construction Grp., Inc.*, No. 5:14-CV-778-JG,

17

2016 WL 5716354, at *5 (E.D.N.C. Sept. 30, 2016) (collecting cases)); *United States ex rel. Virginia Beach Mech. Servs., Inc. v. SAMCO Constr. Co.*, 39 F. Supp. 2d 661, 677 (E.D. Va. 1999) ("[T]he [Prompt Payment] Act indicates again that while contractors can pursue the contractual remedies ordinarily available to them if they do not receive payment, they cannot use the Act as a substantive basis of recovery of that payment when they file their claims pursuant to the Miller Act."); ECF 66-1 at 34-35 (collecting cases).  These cases have held that Congress did not intend to allow private subcontractors to enforce the terms of the PPA.  A party may not get around that bar simply by calling its claim a "breach of contract" rather than a direct violation of the PPA.  If it could, Congress's decision not to provide subcontractors with a private right of action under the PPA would be nullified.

  LRI relies on *Greenbridge* as support for its position.  2021 WL 1060290, at *3.  In that case, the plaintiff made the same argument LRI makes here.  *Id.*  The Honorable Catherine C. Blake of this Court dismissed the plaintiff's claim but wrote, in response to the plaintiff's argument, "the court is unable to discern any basis in the complaint to conclude that count three is an attempt to state a breach of contract claim." *Id.*  Like LRI, the plaintiff there was arguing that its PPA claim should be construed as a breach of contract claim.  *Id.*  But unlike Count III here, the PPA claim in *Greenbridge* was very clearly styled as a direct violation of the PPA (rather than as a breach of contract claim).  *Greenbridge Construction, Inc.*, No. CCB-20-2070, ECF 3 (D. Md. July 15, 2020).  Thus, contrary to LRI's argument, the sentence on which it relies from *Greenbridge* was merely a comment on the factual inaccuracy of the plaintiff's argument, rather than a legal distinction that supports LRI's position here.  Unlike the complaint in *Greenbridge*, LRI is right that its allegations in Count III read much more like a breach of contract claim than a direct claim under the PPA.  ECF 1 at 6.  But LRI's effort, while creative, cannot overcome the

18

fact that the PPA does not allow private subcontractors to bring a lawsuit to enforce its terms. Accordingly, Constellation's motion for summary judgment on Count III will be granted.

### d. Quantum Meruit and Unjust Enrichment (Counts IV-V)

Constellation argues that LRI's equitable claims are duplicative of its contract-based claims and should, therefore, be dismissed. The Federal Rules of Civil Procedure allow parties to plead claims in the alternative. *See* Fed. R. Civ. P. 8(e)(2) ("A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal [or] equitable grounds."). Constellation is correct, though, that LRI will not be able to recover on both its contract-based claims and its quasi-contract claims with respect to the same subject matter. *See, e.g.*, *Carty v. Westport Homes of N.C., Inc.*, 472 F. App'x 255, 258 (4th Cir. 2012) ("The doctrine of unjust enrichment is based on 'quasi-contract' or contract 'implied in law' and thus will not apply here where a contract exists between two parties."); *County Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96 (2000) ("These claims are alternatives to the breach-of-contract claim because in Maryland, as elsewhere, '[t]he general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.'"). But LRI appears to be arguing that it is owed for extra-contractual work it performed. In other words, LRI argues that it performed work for Constellation and the BOP above and beyond the work that was required of it in the SOW. As explained above, the issue of whether (and if so when) LRI completed its performance under the Subcontract is in dispute. Accordingly, it would be premature to grant Constellation's motion for summary judgment on LRI's quasi-contract claims.

### e. Liberty Mutual's Motion for Summary Judgment

Liberty Mutual's motion for summary judgment is entirely duplicative of Constellation's insofar as it relates to Counts I and II of LRI's Complaint. Indeed, Liberty Mutual's briefing merely incorporates the facts and arguments set forth in Constellation's briefing. ECF 65, 84. Because this Court will deny Constellation's motion with respect to Counts I and II of LRI's Complaint, for the reasons explained above, Liberty Mutual's motion will be denied.

### IV. CONCLUSION

For the foregoing reasons, Constellation's motion for summary judgment is GRANTED in part and DENIED in part. Constellation's motion is granted with respect to Count III and denied as to all other counts. Liberty Mutual's motion for summary judgment is DENIED. A separate order follows.

Dated: February 23, 2022                                /s/
                                                 Stephanie A. Gallagher
                                                 United States District Judge