**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                                               |   |                             |
|-----------------------------------------------|---|-----------------------------|
|                                               | * |                             |
| **LIGHTING RETROFIT**                         | * |                             |
| **INTERNATIONAL, LLC**                        | * |                             |
|                                               | * |                             |
| **Plaintiff/Counter-Defendant,**              | * |                             |
| **v.**                                        | * | **Civil Case No. 19-cv-02751-SAG** |
|                                               | * |                             |
| **CONSTELLATION NEWENERGY,**                  | * |                             |
| **INC.,** *et al.,*                           | * |                             |
|                                               | * |                             |
| **Defendant/Counter-Plaintiff.**             | * |                             |
|                                               | * |                             |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OF DECISION</u>

Lighting Retrofit International, LLC ("LRI") brought the instant action against Constellation NewEnergy, Inc. ("Constellation") and its surety, Liberty Mutual Insurance Company ("Liberty Mutual"). The dispute arises out of a subcontract to update lighting and plumbing fixtures at a federal prison in Florida. LRI seeks damages based on Constellation's alleged failure to pay LRI in full pursuant to the parties' subcontract. ECF 1. Constellation filed a counterclaim, asserting that LRI breached the subcontract by, among other things, installing and failing to replace defective lighting products. ECF 53. This Court previously bifurcated the parties' lighting- and plumbing-related disputes. ECF 49.

A bench trial on the lighting-related claims was held on November 14-16, 2022. This Court has considered all the evidence adduced at trial, both testimonial and documentary, as well as the parties' post-trial briefing. *See* ECF 128, 129, 130, 131, 132, 134. The Court has also considered LRI's post-trial motion for leave to amend its Complaint to assert a statute of limitations defense, ECF 133, along with the oppositions to that motion, ECF 135, 136, and LRI's reply, ECF 137. For the reasons discussed below, this Court concludes that LRI breached its contractual warranty by

failing to repair or replace the defective lighting equipment it installed. As a result, Constellation is entitled to judgment on both its breach of contract counterclaim and LRI's affirmative claims. Liberty Mutual is likewise entitled to judgment on LRI's claim under the Miller Act, 40 U.S.C. § 3131. Finally, LRI's post-trial motion to amend its Complaint will be denied.

## I.   Findings of Fact

This Court finds the facts stated herein based on its evaluation of the evidence, including the credibility of the witnesses, and the inferences that this Court has found reasonable to draw from the evidence.

1. On December 17, 2008, Constellation entered into a contract with the federal government to provide "conservation and renewable energy services for Federal facilities." ECF 117 ¶ 1 (Joint Stipulation of Facts).

2. Pursuant to that contract, Constellation and the Federal Bureau of Prisons ("BOP") entered into a task order for the implementation of 11 energy conservation measures ("ECMs") at the Federal Correctional Complex in Coleman, Florida ("FCC Coleman"). *Id*. ¶ 2.

3. FCC Coleman consists primarily of four facilities: United States Penitentiary 1 ("Pen 1"); United States Penitentiary 2 ("Pen 2"); Federal Correctional Institution Coleman Low ("FCI Low"); and Federal Correctional Institution Coleman Medium ("FCI Medium"). *Id*. ¶ 3.

4. At all relevant times, FCC Coleman had 80 high-mast light poles with 728 total light fixtures. *Id*. ¶ 4. Each pole was between 80 and 100 feet tall. ECF 125 at 39:8-13 (Tr. Testimony of R. Lynch).

### a.   The Subcontract Between Constellation and LRI

5. On December 9, 2014, Constellation and LRI entered into a Blanket Subcontract for Energy Projects and Services (the "Subcontract"). ECF 117 ¶ 5; Jt. Ex. 8. The Subcontract provided that "[a]ll work done pursuant to any Scope of Work [between LRI and Constellation] shall be governed by all the provisions of this Subcontract as if said scope was set forth in full herein." Jt. Ex. 8 § 1.0.

6. The Subcontract also contained a warranty provision, *id*. at § 6.8 (the "warranty provision" or "section 6.8"), which provided in relevant part that:

   a. "[LRI] warrants that . . . all equipment will be free from defects and installed in accordance with the manufacturer's specifications . . . .";

   b. "The warranties set forth herein shall continue for a period of one (1) year after the date of Constellation's final acceptance of the work or [BOP's] beneficial use, whichever is later . . . ."; and

   c. "Unless otherwise provided on the Scope of Work, if the services and materials provided by [LRI] hereunder do not conform to the warranties included herein, then [LRI] will (at its sole cost and expense) do any of the following upon Constellation's request: (a) re-perform the services, or repair or replace the equipment, in a satisfactory manner that conforms to the terms of this Subcontract, (b) pay Constellation any money damages that Constellation owes as a result of nonconformance and refund the portion of the cost hereunder which is attributable to such nonconformance, (c) if Constellation chooses to correct the breach by re-performing the services or repairing or replacing the equipment, (by itself or through another subcontractor), pay Constellation any expenses Constellation incurs itself or pays to a third party."

7. Section 7.1 of the Subcontract further stated that LRI would be in material breach if it (i) "refuses or fails to supply . . . proper materials . . ." or (ii) "otherwise is in material breach of any provision of this Subcontract," unless such breach was cured within three days of receiving notice from Constellation. *Id*. §§ 7.1.1, 7.1.5

8. In the event of a material breach, section 7.1.5 of the Subcontract provided that Constellation would have the right to pursue any or all of the following remedies:

3

a. "Supply such number of workers and quantity of materials, equipment and other facilities as Constellation deems necessary for the completion of [LRI's] work; or any part thereof which [LRI] has failed to complete or perform after aforesaid notice, and charge the cost thereof to [LRI]"; or

b. "Contract with one or more additional contractors, to perform such part of [LRI's] work as Constellation believes will provide the most expeditions [sic] completion of the total work and charge the cost thereof to [LRI]"; or

c. "Withhold payment of any moneys due [LRI] pending corrective action in amounts sufficient to cover losses and compel performance to the extent required by and to the satisfaction of Constellation[.]" *Id*. § 7.1.5.

9. Additionally, the Subcontract contained an emergency provision, section 7.4 (the "emergency provision"), which provided in relevant part that "[i]n the event of an emergency affecting safety to persons or property" Constellation may, without notice, "furnish those materials, equipment and/or employ such workers or subcontractors, as Constellation deems necessary or desirable to maintain the orderly progress of [LRI's] work." *Id*. § 7.4. In such a scenario, "all costs incurred by Constellation in performing [LRI's] work, including but not limited to reasonable overhead, profit and reasonable attorneys' fees and expenses, shall be deducted from any moneys due or to become due [LRI]. [LRI] shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the price payable hereunder." *Id*.

10. Finally, the Subcontract included a retainage provision, § 2.2.3, which stated that the rate of retainage withheld by Constellation "shall be equal to the percentage retained in Constellation payment by [BOP] for [LRI's] Work, provided the Subcontractor furnishes a bond or other security to the satisfaction of Constellation." *Id*. § 2.23.

a. Constellation's contract with BOP did not contain a provision to withhold retainage, Jt. Ex. 1, and LRI posted a bond, Jt. Ex. 14.

**b. The Scope of Work Between Constellation and LRI**

4

11. On February 26, 2015, pursuant to the Subcontract, Constellation and LRI entered in a Scope of Work (the "SOW") for "Plumbing and Lighting Improvements for [FCC Coleman]." ECF 117 ¶ 6. The parties revised the SOW on March 24, 2015. *Id*.

12. The SOW required LRI to complete two energy conservation measures ("ECMs"): one for lighting ("ECM1") and one for plumbing ("ECM2"). *Id*. It further provided that: "[LRI] will provide final design and [all items] necessary to implement a fully functional project." Jt. Ex. 11 at 1.

13. Among other things, ECM1 required LRI to retrofit each high-mast lighting fixture with an LED fixture manufactured by Global Tech (the "retrofit kits"). Jt. Ex. 11 at 1.

14. The retrofit kits replaced the interior components of the high-mast light housing, rather than replacing the entire fixture. ECF 125 at 39:8-43:8 (Tr. Testimony of R. Lynch).

15. The total maximum price for the lighting and plumbing work pursuant to the parties' SOW and subsequent change orders was $12,545,349.62, with a required competition date of March 31, 2019. *Id*. ¶ 13.

16. From March 2015 through March 2019, LRI submitted 40 payment applications to Constellation, each of which included a deduct for 10% to be withheld as retainage by Constellation. *See* Jt. Exs. 15, 19, 21, 23, 24, 26, 29, 32, 36, 48, 50, 54, 60, 63, 68, 71, 74, 76, 80, 88, 94, 96, 98, 99, 101, 102, 104, 107, 124-26, 128, 136, 138, 144, 148, 151, 157, 159, 169.

17. To date, Constellation has paid LRI $11,870,007.29 of the project price. *Id*. ¶ 28. Of the remaining balance, $177,635.65 is retainage withheld by Constellation on amounts paid to LRI for completed ECM1 work. *Id*. ¶ 29.[1]

**c. Installation of the Retrofit Kits and Subsequent Failures**

18. By the end of 2015, LRI had installed the retrofit kits in each of the 728 light fixtures on the high-mast poles at FCC Coleman. *Id*. ¶ 17.

19. By November 5, 2015, BOP provided Constellation with signed beneficial use certificates, stating that it had received beneficial use for all four buildings at FCC Coleman (Pen 1, Pen 2, FCI Low, and FCI Medium). Jt. Ex. 379. Constellation did not provide those certificates to LRI. ECF 125 at 81:7-82:25 (Tr. Testimony of R. Lynch).

20. Each of the retrofit kits contained, among other things, four LED light pucks and two drivers. *Id*. ¶ 20.

21. Global Tech defectively designed the retrofit kits so that they overheated, which caused the drivers to fail prematurely. *Id*. ¶ 19.

22. Specifically, LRI's expert witness, Kevin R. Davis, observed in an October, 2017 report that the internal temperature of the retrofit kits was measured at approximately 105 degrees Celsius. Jt. Ex. 318 at 33-34 (Oct. 19, 2017 Report of K. Davis); *see also* ECF 126 at 85:22-24. (Tr. Testimony of K. Davis). This was well above the driver manufacturer's maximum allowable operating limit of 70 degrees Celsius. Jt. Ex. 318 at 33-34.

---

[1] The remainder of the unpaid balance consists of scope work and retainage attributable to ECM2 and is not sought by LRI as part of this trial. *Id*. ¶¶ 28, 29.

23. This flawed design was never changed after installation, meaning the retrofit kits were defective from the time they were installed through June, 2019, when LRI walked off the job. *See* Jt. Ex. 184 at 1 (June 21, 2019 letter from R. Lynch) (acknowledging that "LRI and [Constellation] agree that [the] retrofit kits installed on the Project are defective").

24. The drivers within the retrofit kits almost immediately experienced a "high failure rate" after installation. ECF 125 at 182:1 (Tr. Testimony of R. Lynch); *see also* ECF 127 at 22:21-24, 26:8-14 (Tr. Testimony of D. Benham).

25. By August 17, 2015, Constellation's site superintendent at FCC Coleman had emailed individuals at LRI to state that he had "concerns about the high mast fixtures" and that those fixtures appeared to be experiencing "a higher rate of failure than might be acceptable." Jt. Ex. 25.

26. While a three percent failure rate of the drivers in the retrofit fits was expected in the months following installation, Jt. Ex. 64 at 2, the actual failure rate was, according to Davis, "a lot higher than that." ECF 126 at 92:8-9; *see also* Jt. Ex. 65 at 1.

27. By August, 2016, an LRI employee reported that nearly 30 percent of the high-mast fixtures were not operating. Jt. Ex. 75(a) at 2 (Aug. 25, 2016 email from J. Quinn). Furthermore, 20 out of the 21 poles which held the high-mast fixtures had experienced a failure. *Id*.

28. In October, 2016, LRI's vice president of project development, Richard Lynch, cautioned that there were "entire poles not working that will cause emergency action in the very near future." Jt. Ex. 87 at 1.

29. In September, 2017, BOP declared an "emergency status" at USP1 and FCI Medium. Jt. Ex. No. 108 (Sept. 13, 2017 email from S. Price). Constellation's on-site supervisor forwarded that notification to LRI and stated: "We need emergency lights on si[t]e ASAP." *Id*. (Sept. 13, 2017 email from N. Lambdin).

30. LRI continued replacing drivers within the retrofit kits, at its own cost, from August, 2015 to June, 2019. ECF 117 ¶ 21; ECF 125 at 204:15-205:1 (Tr. Testimony of R. Lynch).

31. In total, LRI replaced 947 drivers in that time period. *Id*. Of those drivers that were replaced, 23 percent were replaced multiple times. ECF 117 ¶ 22.

**d. LRI's Investigation into the Driver Failures**

32. In 2015, LRI commenced an investigation to determine the cause of the driver failures. Jt. Ex. 27.

33. On October 28, 2015, Lynch received a report from the manufacturer of the failing drivers, Inventronics, (the "Inventronics Report") which suggested that LRI investigate "the input voltage, ambient temperature [and] the load etc." Jt. Exs. 30, 31. Lynch also forwarded the Inventronics Report to an employee at Constellation, John Hendrick. Jt. Ex. 43.

34. Lynch testified that LRI initially focused its investigation on power quality issues and did not follow-up on the manufacturer's suggestion that it also investigate the temperature within the fixtures. ECF 125 at 163:8-21.

35. In October 2016, LRI retained Davis, who recommended that thermal testing strips be installed in the retrofit kits. Jt. Ex. 81.

36. At some point after Davis's recommendation, LRI procured temperature strips and installed them in certain fixtures. ECF 126 at 38:16-24 (Tr. Testimony of J. Quinn).

37. John Quinn, LRI's project manager at FCC Coleman, testified that in July, 2017, a temperature strip indicated a temperature inside one of the fixtures of 104 degrees Celsius. *Id*. at 40:2-10.

38. In October, 2017, Davis issued his report concluding that elevated temperatures within the retrofitted fixtures were responsible for the driver failures. Specifically, the report stated that "the selected LED drivers were thermally incompatible with the design of the given light fixture and retro-fit design." Jt. Ex. 318 at 35 (Oct. 19, 2017 Report of K. Davis). The report further opined that "[a] rudimentary thermal design study would have prevented implementation of the design as presented." Jt. Ex. 318 at 22.

**e.  Constellation and LRI Fail to Agree on a Replacement Solution**

39. Throughout the investigation into the driver failures, Constellation continued to press LRI to find "a long term solution to these mounting failures." Jt. Ex. 38 (Dec. 3, 2015 email from R. Lynch); *see also* Jt. Exs. 41, 57, 70.

40. By 2018, LRI had begun researching replacements retrofit kits that "won't burn up" inside the existing enclosures. *See* Jt. Ex. 114 (Jan. 11, 2018 email from R. Lynch).

41. In January 2018, Lynch quoted two potential replacement products: an alternative retrofit kit from "small" company with an "unknown product," and a new, Holophane fixture from a "tried and true LARGE reputable company." Jt. Ex. 116 at 2 (Jan. 15, 2018 email from R. Lynch).

42. According to Lynch's analysis, the Holophane fixtures would be less risky and would cost less than the replacement retrofit kit, leading Lynch to conclude that the "[b]est

solution is to switch all Highmast out with the new" Holophane fixtures. *Id*.; *see also* ECF 125 at 196:7-11 (Tr. Testimony of R. Lynch).

43. LRI's project manager, John Quinn, agreed with Lynch's conclusion, stating: "Replacing with new fixtures from [a] reputable manufacturer which is also [a] cheaper alternative definitely seems like the way to go." Jt. Ex. 116 at 1 (Jan. 15, 2018 email from J. Quinn).

44. On October 19, 2018, LRI sent its formal proposal to replace the defective retrofit kits with the Holophane fixtures for a total cost of $1,851,274. ECF 117 ¶ 36; Jt. Ex. 153. However, in its proposal, LRI stated its position that "LRI should not bear the full cost of this fixture upgrade solution." *Id*.

45. Ultimately, LRI and Constellation could not agree on which of them bore the responsibility for purchasing and installing the Holophane fixtures. ECF 117 ¶ 37.

46. Specifically, Constellation informed LRI that it would not share the cost to purchase and install the Holophane fixtures, and also that it would not reimburse LRI for any of its ongoing driver repairs because "it was LRI's burden to bear." ECF 125 at 212:3-8 (Tr. Testimony of R. Lynch).

   **f.   LRI Walks Off the Job and Constellation Procures "Emergency" Lighting**

47. LRI left the job site no later than June, 2019. *Id*. ¶ 38.

48. On June 28, 2019, Constellation's project manager, David Benham, alerted LRI that there were 21 poles that BOP had defined as "911/emergency areas that have immediate impact upon the security of the campus" Jt. Ex. No. 188 at 2 (June 28, 2019 email from D. Benham). Benham cited to the Subcontract's emergency clause and stated that: "If LRI is unable to provide and install the drivers within the next 8 hours then LRI will

10

need to provide at their expense temporary lighting in the 911/emergency areas until the material can be obtained and the issues resolved." *Id*.

49. LRI did not respond to Benham's request to replace the drivers or provide emergency lighting. Jt. Ex. 190 (July 2, 2019 email from D. Benham.)

50. On July 2, 2019, Benham sent LRI a quote for emergency lighting, noting that, absent a response from LRI, "[Constellation] will have no other choice but [to] procure this lighting and back charge LRI." *Id*.

51. LRI responded by denying that it was responsible for providing the temporary lighting. Jt. Ex. 193 (July 8, 2019 email from J. Quinn).

52. Between July and December 2019, Constellation incurred $245,597.76 in out-of-pocket costs to provide emergency high-mast lighting at FCC Coleman. ECF 117 at ¶ 35. These costs included rentals of temporary lighting equipment and diesel fuel to power that equipment. *Id.*; *see also* ECF 127 at 16:1-17:1 (Tr. Testimony of D. Benham).

53. On July 15, 2019, Constellation sent LRI a "Notification of Breach" letter. Jt. Ex. 196 at 1. Among other things, the letter stated that LRI was in breach for failing to comply with the Subcontract's warranty provision with respect to the retrofit kits. *Id*.

54. LRI rejected Constellation's Notification of Breach on July 19, 2019. Jt. Ex. 199.

**g.  Constellation Contracts with a Third-Party to Install Replacement Lighting**

55. On September 20, 2019, Constellation entered into a contract with Aelux, LLC ("Aelux") for Aelux to purchase and install 728 Holophane fixtures at FCC Coleman at a price of $1,275,517. ECF 117 ¶ 40.

56. By no later than February, 2020, Aelux purchased and installed the new Holophane fixtures at FCC Coleman. *Id*. ¶ 41.

57. Constellation paid Aelux the full $1,275,517 contract price for the purchase and installation of the new Holophane fixtures. *Id*. ¶ 42.[2]

   **h.   Procedural History**

58. On September 17, 2019, LRI filed this action asserting, with respect to Liberty Mutual, a claim under the Miller Act, 40 U.S.C. § 3131, *et. seq*. (Count I), and, with respect to Constellation, claims for breach of the Subcontract (Count II), violation of the Prompt Payment Act, 31 U.S.C. § 3901, *et seq*. (Count III), quantum meruit (Count IV), and unjust enrichment (Count V).

59. On February 18, 2021, Constellation filed its Answer, Affirmative Defenses, and First Amended Counterclaim against LRI. ECF 53.

60. On February 23, 2022, this Court awarded partial summary judgment to Constellation on Count III of LRI's complaint. ECF 87.

61. The bifurcated trial for ECM1 was held on November 14-16, 2022. ECF 120-22.

62. After LRI rested its case-in-chief, this Court granted in part Constellation and Liberty Mutual's motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c), awarding Constellation and Liberty Mutual judgment on LRI's claims relating to two ECM1-related change orders. ECF 127 at 3:5-10:18. However, the Court

---

[2] Constellation also initially sought, as part of its counterclaim, another $118,787.86 it paid to Aelux for the purchase and installation of additional, interior lighting work at FCC Coleman. ECF 100 at 22-23; *see also* ECF 117 ¶¶ 43-47. However, at trial, Constellation withdrew this claim. *See* ECF 126 at 45:11-23.

denied the motion with respect to LRI's claim for ECM1-related retainage in the amount of $177,635.65. ECF 126 at 163:11-15.

## II.    Conclusions of Law

In essence, three "claims" remain at issue with respect to ECM1. First, LRI seeks the $177,635.65 in retainage, which it argues Constellation has unlawfully withheld. Second, Constellation contends that LRI is liable for the $1,275,517 it paid to Aelux to replace the defective high-mast lights with Holophane fixtures. Finally, Constellation seeks $245,597.76 for the emergency lighting costs incurred after LRI left the job site in June, 2019. As discussed below, the disposition of the ECM1-related retainage ultimately depends on the outcome of Constellation's counterclaims. Therefore, this Court will begin by analyzing whether LRI is liable to Constellation for the cost of replacing the defective retrofit kits and for the emergency lighting costs, before proceeding to LRI's retainage claim.

### a.   Constellation's Counterclaims

#### i.   *Replacement Holophane fixtures*

"Under Maryland law, to sustain a breach of contract claim, 'a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.'" *John & Cher, Inc v. Howard Bank*, No. 1:18-cv-2887-SAG, 2021 WL 2226195, at *2 (D. Md. June 2, 2021) (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)). Here, Constellation argues that LRI breached its obligations under the Subcontract's warranty provision. Specifically, under section 6.8, LRI warranted, among other things, that "all equipment [provided] will be free from defects." Jt. Ex. 8, § 6.8. This warranty continued for one year from "the date of Constellation's final acceptance of the work or Customer's beneficial use, whichever is later." *Id*. The warranty provision further provided, if any equipment was defective, LRI would

13

be required to do one of the following, at its sole cost and expense: (a) "repair or replace the equipment"; (b) pay money damages resulting from the nonconformance; or (c) "pay Constellation any expenses Constellation incurs itself or pays to a third party" to repair or replace the equipment. *Id.*

This Court agrees with Constellation that LRI breached its repair-and-replace obligations under the warranty provision.[3] Initially, the parties stipulate that the retrofit kits were "defectively designed . . . so that they overheated, which caused internal components to fail." ECF 117 ¶ 19; *see also Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 123 (4th Cir. 2019) (holding that a stipulation is a "conclusive resolution of a factual issue"). The evidence adduced at trial supports this conclusion. Specifically, Davis's October, 2017, report stated that the failing drivers "were thermally incompatible with the design of the given light fixture and retro-fit design," and further that "[a] rudimentary thermal design study would have prevented implementation of the design as presented." Jt. Ex. 318 at 22, 35. Thus, from the time of installation forward, LRI was in breach of the warranty provision's requirement that all equipment used in the project be "free from defects." Jt. Ex. 8 § 6.8. Further, the retrofit kits remained defective when LRI left the FCC Coleman job site in June, 2019. Indeed, that month, Lynch wrote in a letter to Constellation that "LRI and CNE agree that [the] retrofit kits on the Project are defective." Jt. Ex. 184 at 1.

That failure to install a functioning, non-defective product, in turn, triggered Constellation's right to the remedies set forth in the warranty provision, under which Constellation could require LRI to repair or replace the defective equipment. Jt. Ex. 8 § 6.8. Although LRI

---

[3] Because this Court concludes that LRI is liable pursuant to the Subcontract's warranty provision, it need not consider whether Constellation can recover under the 10-year, pass-through warranty from Global Tech on the retrofit kits. ECF 129 at 22-29.

complied with its remedial obligations for the first few years by replacing drivers and investigating a permanent solution, it breached those obligations in June, 2019 when it walked off the job site and refused to purchase and install the new Holophane fixtures. Thus, LRI is liable to Constellation for the cost to replace the retrofit kits with a non-defective lighting product. *See Fowlkes v. Choudhry*, 248 A.3d 298, 310 (Md. 2021) ("[A] party injured by a breach of contract has a right to damages based on his expectation interest." (quotation omitted)). Moreover, the parties do not dispute that the new Holophane fixtures were the most effective and cost-efficient replacement solution. While LRI did price out an alternative LED retrofit kit, this product was more expensive and manufactured by a smaller, unproven company. *See* Jt. Ex. 116 (Jan. 15, 2018 email from R. Lynch). Both Lynch and Quinn were unequivocal that the "best solution" was to switch out the LED fixtures for the new Holophane lights. *Id.*; Jt. Ex. 116 (Jan. 15, 2018 email from J. Quinn). Thus, LRI's argument that the proper remedy under the warranty "was to require repairs, not wholesale replacements with better fixtures," is wholly misplaced, where (1) LRI itself pinpointed the Holophane product as the only logical solution, and (2) repairing or replacing the LED high-mast lights through the use of another retrofit kit would have been more expensive and carried a higher risk of failure.

Alternatively, LRI is liable to Constellation under section 7.1.5 of the Blanket Subcontract. That provision provides that, upon a material breach of the Subcontract, Constellation would be entitled to (among other things) "[c]ontract with one or more additional contractors, to perform such part of [LRI's] work as Constellation believes will provide the most expeditions [sic] competition of the total work and charge the cost thereof to [LRI]." Jt. Ex. 8 § 7.1.5(b). As noted above, LRI breached its repair-and-replace obligation in June 2019, which in turn caused Constellation to engage with Aelux. And, for the reasons explained above, Constellation

reasonably concluded that the Holophane solution from Aelux was the most expeditious and cost-efficient way to complete LRI's work of delivering a "fully functional" lighting improvement project at FCC Coleman. Jt. Ex. 11 at 1. LRI's refusal to pay Constellation for the costs incurred to hire Aelux therefore violated section 7.1.5.

LRI's additional arguments against liability for the Holophane lights also miss the mark. First, LRI contends that the one-year warranty period set forth in section 6.8 expired in November, 2016, long before Constellation engaged with Aelux. Specifically, the warranties in section 6.8 lasted for "one (1) year after the date of Constellation's final acceptance of the work *or* [BOP's] beneficial use, *whichever is later*" (emphasis added). As LRI correctly notes, BOP issued beneficial use certificates for all high-mast lighting at FCC Coleman by November, 2015. Jt. Ex. 379. However, there is no indication that Constellation ever accepted LRI's work installing the retrofit kits, as would be required to start the one-year warranty period. To the contrary, the record shows that, from the time the driver failures began, Constellation repeatedly and consistently demanded a long-term solution from LRI to remedy the defective lighting kits. In December, 2015, for example, Constellation's then-site manager informed LRI that the lighting failures were "your issue" and that LRI "owe[d Constellation] an operating system in the environment that has been open to your inspection pre dating your proposal." Jt. Ex. 41 at 2 (Dec. 8, 2015 email from M. Lambdin). Constellation maintained a similar position in March and June, 2016, with another Constellation employee reiterating to Lynch that he was "looking to you to solve this issue" and that it was LRI's role "as our sub to find a solution." Jt. Ex. 57 at 1-2 (March 14, 2016 email from R. McNair); Jt. Ex. 70 at 1 (June 21, 2017 email from R. McNair). In short, there is no evidence indicating that Constellation ever accepted LRI's lighting work, thereby starting the one-year warranty period. Nor is Constellation's withholding of acceptance unreasonable, given the

immediate and persistent failure of the drivers and the associated lighting and safety issues at FCC Coleman.

Next, LRI argues that Constellation's claim is barred by Maryland's three-year statute of limitations. Md. Ann. Code, Cts. & Jud. Proc. § 5-101. Initially, LRI did not assert a statute of limitations defense in its answer to Constellation's counterclaim. *See* ECF 56. After trial, however, LRI filed a motion for leave to amend its answer to assert a limitations defense. ECF 133. Amendments during and after trial are governed by Federal Rule of Civil Procedure 15(b), which states that "[a] party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2). "Whether or not a plaintiff should be allowed to amend his complaint to conform to the evidence is a discretionary determination to be made by the district court . . . ." *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 118 (4th Cir. 2021) (quotation omitted) (alterations adopted); *see also Woodson v. Allstate Ins. Co.*, 855 F.3d 628, 635 (4th Cir. 2017) (noting that "as a general matter, the defense of limitations must be raised by an affirmative defense presented in the answer or an amendment to the answer or it will be 'forfeited'"). Here, LRI argues that Constellation "shifted" the theory of its counterclaim at trial, arguing for the first time that LRI breached the Subcontract in 2015, when the defective retrofit kits were installed. ECF 133-1 at 4-6. Thus, LRI contends it would be "inequitable and grossly prejudicial" to prevent LRI from asserting its limitations defense. *Id.* at 6.

LRI's last-ditch attempt to rely on a statute of limitations defense is misplaced. First, this Court is unconvinced that Constellation "shifted" its theory at trial so as to justify LRI's failure to previously raise a limitations defense. Constellation argued in multiple pretrial filings that the retrofit kits were defective from the moment they arrived at FCC Coleman. *See, e.g.*, ECF 100 at

10, 12 (Constellation's pretrial bench memorandum); ECF 101 at 6 (pretrial order). LRI even acknowledged in its initial post-trial brief that Constellation "oft argued" that the retrofit kits were defective from the moment of installation. ECF 129 at 28. Nonetheless, LRI never sought to amend its pleading to assert a statute of limitations defense until nearly two months after trial. LRI's failure to timely seek amendment of its pleading, alone, provides an adequate basis for denying its motion for leave to amend its answer. *See Foodbuy*, 987 F.3d at 118 n.15 (affirming the district court's denial of a motion for leave to assert a statute of limitations defense, where the defendant failed to bring the motion until "several days into trial, after the Parties had already questioned witnesses").

Even if LRI's delay in asserting a limitations defense was justified, denial of the motion for leave to amend is appropriate because the proposed amendment would be futile. *See Jefferson v. Sch. Board of City of Norfolk*, 452 F. App'x 356, 358 (4th Cir. 2011) (affirming the denial of a motion to amend under Rule 15(b) where such amendment would be futile). Put simply, LRI's limitations argument misapprehends the basis for Constellation's claims. While LRI's installation of the admittedly defective retrofit kits in 2015 ran afoul of the Subcontract's requirement that LRI install equipment that was "free from defects," Jt. Ex. 8 § 6.8, it is not that breach that forms the basis of Constellation's counterclaim. Rather, Constellation's claim for the cost of the Holophane lights is based on LRI's failure, once the defective product was installed, to satisfy the Subcontract's remedial obligations. Specifically, section 6.8 required that LRI "will (at its sole cost and expense) . . . repair or replace the [defective] equipment" upon Constellation's request. Constellation has consistently asserted—before, during, and after trial—that it was entitled to recovery based on LRI's failure to satisfy the Subcontract's repair-and-replace obligations. *See, e.g.*, ECF 101 at 6, 8 (noting, in the pre-trial order, that the Subcontract "obligated LRI to repair

or replace the defective retrofit kits," and further that LRI "failed to meet [this] central obligation"); ECF 126 at 143:4-5 (Nov. 15 Tr. Transcript) (explaining that Constellation's "cause of action accrues when [LRI] refuse[s] to make the replacement"). As explained above, LRI at first complied with its remedial obligations. It replaced failing drivers, investigated the root cause of the failures, and, once it identified that root cause, proposed the Holophane replacement solution. However, LRI walked off the job in June 2019, after Constellation and BOP refused to share the cost of installing the Holophane fixtures. At that point, LRI was in breach of its repair-and-replace obligation, and Constellation's cause of action for breach of contract accrued. *See President & Directors of Georgetown Coll. v. Madden*, 505 F. Supp. 557, 564 n.8 (D. Md. 1980) ("Refusal to repair such defective work would have resulted in a separate breach of contract aside from the breach resulting from the defective work."); *Antigua Condo. Ass'n v. Melba Investors Atl., Inc.*, 517 A.2d 75, 83 (Md. 1986) (explaining that a party may breach its contractual promise to repair by, inter alia, "repudiating the obligation before any notice is given, . . . failing to undertake the repairs within a reasonable time, expressly refusing to repair, *or, after undertaking to repair, abandoning the work before completion*" (emphasis added)).

The then-Maryland Court of Appeals's analysis in *Antigua* is instructive. That case involved a suit by condominium owners against a developer over various defects in their units. *Id.* at 79. The form contract used by the developer included a promise to "make any necessary repairs, adjustments, or replacements" of defective construction, if notice of the defects was given within one year of settlement. *Id.* Plaintiffs alleged that the developer, after receiving timely notice of the defects, tried unsuccessfully for three years to resolve them before refusing to take further remedial action. *Id.* at 79-80. By the time the owners sued, four years had elapsed from the time the developer was notified of the defects. *Id.* at 78-79. In reversing the lower courts' dismissal of the

suit as untimely, the court explained that the parties' contract included both "a warranty of the condition" of the condos and a "promise[] to repair." *Id.* at 82. Because the Antigua plaintiffs' suit was based at least in part on the developer's promise to repair, the statute of limitations began running when the plaintiffs should have discovered the breach of that contractual repair provision—not when the plaintiffs discovered the defects. *Id.* at 83-84. An identical analysis applies here. Section 6.8 of the Subcontract included both a warranty that the equipment installed by LRI be "free from defects," as well as an obligation, upon request by Constellation, to repair and replace defective equipment. Jt. Ex. 8 § 6.8. As explained above, this Court finds that Constellation did not have notice of LRI's breach of its repair-and-replace obligations until LRI walked off the job in June 2019. LRI commenced this suit two months later, thereby rendering Constellation's breach of contract well within the statute of limitations. *See Kirkpatrick v. Lenoir Cty. Bd. of Educ.*, 216 F.3d 380, 388 (4th Cir. 2000) (compulsory counterclaim relates back to the filing of the plaintiff's complaint).

Finally, even if Constellation's counterclaim was based on the warranty against defective equipment—rather than the failure to repair or replace—that claim would still be timely under Maryland's discovery rule. Under that rule, the statute of limitations would not have started running until Constellation "in fact knew or reasonably should have known" that the retrofits were actually defective. *McGinty v. Player*, 396 F. Supp. 2d 593, 599 (D. Md. 2005) (internal quotation marks omitted). As Constellation rightly points out, section 6.8 warranted against "defects" in the lighting equipment installed by LRI, not "failures" of that equipment. While the retrofit kits began malfunctioning shortly after their installation in 2015, the parties did not learn that the design was "thermally incompatible" with the drivers powering the LED lights until Davis's October, 2017 report. Prior to that moment, LRI had repeatedly suggested that lighting failures were the result of

extrinsic causes (such as power surges or other transient issues) rather than a defect in the design of the retrofit kits. *See* ECF 125 at 163:17-21 (Tr. Testimony of R. Lynch). Thus, Constellation could not have reasonably known the kits were defective until October, 2017, rendering its counterclaim well within the three-year limitations window.[4]

Accordingly, for the reasons stated above, LRI's motion to amend its answer to assert a statute of limitations defense, 133, will be DENIED. LRI violated its repair-and-replace obligations in the Subcontract when it refused to purchase and install the Holophane replacement lights. As a result, LRI is liable to Constellation for the amount paid to Aelux to install the replacement high-mast lighting at FCC Coleman.

*ii.   Emergency lighting costs*

Constellation also seeks $245,597.76 in out-of-pocket costs it incurred to provide emergency lighting at FCC Coleman between July, 2019 and December, 2019. The emergency provision of the Subcontract provided, in relevant part, that "[i]n the event of an emergency affecting safety to persons or property" Constellation may, without notice, "furnish those

---

[4] LRI argues that Constellation was on notice in 2015 that the Global Tech retrofit kits were hopelessly defective and required replacement. Specifically, LRI notes that the Inventronics Report, which suggested that LRI investigate "the input voltage, *ambient temperature* [and] the load, etc." Jt. Ex. 30 at 2, was forwarded to a Constellation employee in December, 2015. LRI thus contends that Constellation should have, through the exercise of due diligence, discovered the kits' thermal defects at that point. But Constellation repeatedly, and reasonably, relied on its subcontractor, LRI, to determine the underlying cause of the lighting failures at FCC Coleman. Jt. Ex. 41, 57, 70. And for more than a year after the failures began, LRI continuously asserted that the lighting failures likely were caused by power quality or other transient issues. *See* ECF 125 at 163:17-21 (Tr. Testimony of R. Lynch). Indeed, after receiving the Inventronics Report, Lynch advised Constellation that Inventronics's recommended next steps included examining surge suppression and voltage issues, but omitted the suggestion to check the ambient temperature. Jt. Ex. 43. Under these circumstances, the Court declines to find that Constellation should have ignored LRI's assurances that it was addressing the issue, *see, e.g.*, Jt. Ex. 41, and conducted its own separate investigation into the thermal design of the retrofit kits.

materials, equipment and/or employ such workers or subcontractors, as Constellation deems necessary or desirable to maintain the orderly progress of [LRI's] work." Jt. Ex. 8 § 7.4. Furthermore, this provision entitled Constellation to recover from LRI "[a]ll costs incurred . . . in performing [LRI's] work, including but not limited to reasonable overhead, profit and reasonable attorneys' fees and expenses." *Id*. In this case, after LRI left the job site, BOP declared numerous "emergency areas" at FCC Coleman due to insufficient lighting. Jt. Ex. No. 188 at 2 (June 28, 2019 email from D. Benham). As a result, Constellation requested in June, 2019, that LRI immediately install replacement drivers in the emergency areas, or else it would be required to provide temporary lighting. *Id*. After LRI failed to replace the drivers and denied responsibility for the temporary lighting equipment, Constellation proceeded to procure the necessary rental equipment and fuel to provide temporary lighting. ECF 117 ¶ 35. These temporary lighting measures remained in place for the next several months until Aelux replaced the LED high-mast lights with new Holophane fixtures.

The parties do not dispute the amount of the costs incurred by Constellation to provide temporary lighting. Rather, LRI argues, first, that these costs are not covered under the emergency provision because that provision is merely "directed at CNE's costs for performing and/or completing work that falls under the Scope of Work." ECF 129 at 27. In other words, because the emergency lighting costs were not directly attributable to the installation of replacement fixtures, LRI contends that they are not covered. This Court declines to read the emergency provision so narrowly. Notably, section 7.4 employs broad language, permitting Constellation to recover "*[a]ll* costs incurred by Constellation in performing [LRI's] work, *including but not limited to*" indirect costs, like attorneys' fees and expenses. Jt. Ex. 8 § 7.4 (emphasis added); *see also Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) ("The word 'includes' is usually a term of

enlargement, and not of limitation."). Furthermore, LRI's "work" in this instance included, under the SOW, the obligation to "implement a fully functional project," Jt. Ex. 11 at 1, and, under the warranty provision, the obligation to repair or replace defective equipment it installed, Jt. Ex. 8 § 6.8. Constellation was forced to undertake this work in June, 2019, when LRI stopped all work at FCC Coleman. And, in light of the urgent security concerns at that time, this Court finds that the "orderly progress" of the ECM1 work (and indeed, the overall functioning of the prison) required Constellation to provide a temporary lighting solution. Thus, Constellation is entitled under the emergency provision to collect costs for temporary lighting equipment and fuel.

Alternatively, even if the emergency provision did not cover the temporary lighting costs, those expenses would be recoverable by Constellation as incidental damages for LRI's breach of the warranty provision's repair-and-replace obligation. In Maryland, the injured party in a breach of contract action has the right to damages for any "incidental or consequential loss, caused by the breach." *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*, 532 A.2d 694, 697 (Md. 1987). "Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss[.]" Restatement (Second) of Contracts § 347, cmt. c (1981); *see also Fort Myer Construction Corp. v. Banneker Ventures LLC*,  No. 1002, Sept. Term, 2019, 2021 WL 5234692, at *22 (Md. Ct. Spec. App. Nov. 10, 2021). In June, 2019, BOP alerted Constellation that it had declared numerous "911/emergency areas that have immediate impact upon the security of the campus." Jt. Ex. No. 188 at 2 (June 28, 2019 email from D. Benham). Constellation's contract with BOP required it to take immediate action in such emergency scenarios to mitigate potential security threats. *See* ECF 127 at 38:15-39:2; Jt. Ex. 11 at 52, § C.9 (BOP Task Order with Constellation, dated Dec. 12, 2014). Benham communicated Constellation's contractual obligation to address the lighting emergencies to LRI, and further advised that if LRI did not conduct immediate repairs or

provide an interim solution, CNE would be forced to procure temporary lighting and charge any costs back to LRI. Jt. Ex. 188 (June 28, 2019 email from D. Benham). When LRI subsequently disclaimed responsibility for temporary lighting and refused to replace the defective retrofit kits, CNE was forced to take action to avoid breaching its agreement with BOP. Thus, the costs incurred by Constellation for temporary lighting are recoverable as incidental damages resulting from LRI's breach of the Subcontract.

Finally, LRI asserts a failure to mitigate defense, arguing that Constellation's own actions are primarily responsible for the emergency costs. The mitigation of damages doctrine "serves to reduce the amount of damages to which a plaintiff might otherwise have been entitled had he or she used all reasonable efforts to minimize the loss he or she sustained as a result of a breach of duty by the defendant." *Fort Myer Construction Corp.*, 2021 WL 5234692, at *22 (quotation omitted); *see also Sergeant Co. v. Pickett*, 401 A.2d 651 at 659-60 (Md. 1979). "When it is determined that the doctrine applies, the burden is necessarily on the defendant to prove that the plaintiff failed to use 'all reasonable efforts to minimize the loss he or she sustained.'" *Cave v. Elliott*, 988 A.2d 1, 19 (Md. Ct. Spec. App. 2010) (quotation omitted). Here, LRI contends that Constellation's emergency lighting costs were incurred primarily as a result of (1) the fact that Constellation, beginning in July, 2018, prevented LRI from regularly replacing drivers, and (2) Constellation's failure to engage with LRI on its repeated proposals, which began in October, 2018, to replace the failing fixtures with Holophane lights. As to the first contention, LRI points to an email from Quinn in June, 2019, stating that "[r]egular maintenance driver replacements were halted in summer 2018" at Constellation's instruction "due to excessive wear on lowering equipment." Jt. Ex. 183(a) (June 14, 2019 email from J. Quinn). However, Quinn also noted that "[w]e have been addressing driver replacements upon receipt of emergency [requests] since that

time." *Id*. Thus, LRI fails to explain why it was unable to replace drivers or take other remedial action in response to BOP's emergency declarations in June, 2019. Furthermore, while LRI faults Constellation for "dither[ing] over discussions of replacement costs," ECF 132 at 9, the record merely reflects disagreement among the parties and BOP over who should bear responsibility for the cost of the Holophane replacements. For example, in its initial proposal in November, 2018, LRI requested that BOP and Constellation provide $572,979 and $525,000, respectively, to cover the cost of the replacement fixtures, in exchange for LRI absorbing previous legal, engineering, and maintenance costs related to the defective retrofit kits. ECF 155 at 3. In rejecting that proposal, Constellation was clear that it would not be willing to reimburse LRI's warranty costs related to the Global Tech product or provide any additional financial contribution, beyond what it had already paid LRI for the purchase and installation of the Global Tech product. ECF 158. Nonetheless, LRI's subsequent proposals included similar cost-sharing requests. ECF 160, 174, 184. Furthermore, the record evidence shows that Constellation forwarded LRI's proposal to BOP and requested that BOP cover the difference in cost between the LRI's Holophane proposal and the Global Tech product. ECF 161, 175. BOP eventually rejected LRI's proposal. ECF 182. While LRI may disagree with Constellation's unwillingness to share costs for the Holophane replacements, the Subcontract did not require Constellation to do so, and the record does not show an unreasonable delay in negotiations attributable to Constellation. Thus, LRI has failed to meet its burden in showing that Constellation was at fault for the emergency lighting costs or otherwise failed to mitigate its damages. Constellation is entitled to recover the emergency lighting costs incurred as a result of LRI's breach of the Blanket Subcontract.

### b.  LRI's Retainage Claim

As noted above, LRI's only remaining claim with respect to ECM1 involves the $177,635.65 in retainage withheld by Constellation. In brief, LRI contends that Constellation did not have a right to withhold retainage pursuant to section 2.2.3 of the Subcontract. *See* ECF 129 at 13-19.

Initially, this Court notes that, regardless of the contractual language, LRI voluntarily included in each of its first 40 payment applications a 10 percent deduction to be withheld as retainage. *See* Findings of Fact ¶ 17; *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 25 A.3d 967, 983 (Md. 2011) (defining waiver as "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right" (quotation omitted)). But even if LRI did not waive its right not to have retainage withheld, Constellation was entitled to withhold those amounts under section 2.2.6 of the Subcontract. That provision allowed Constellation to "withhold amounts . . . as may reasonably be necessary to protect Constellation and/or the Customer from loss or damage for which Constellation may be liable or may suffer, all without incurring an obligation for late payment interest, based upon [LRI's] failure to . . . timely or accurate[ly] perform the Work, [and] for loss or damage arising out of or relating to this Agreement and caused by [LRI]." Jt. Ex. 8, § 2.2.6. As discussed above, the retrofit kits began malfunctioning immediately after installation, meaning LRI never satisfied its obligation to provide a fully functional project under the Subcontract and the SOW. In light of these failures, the Subcontract permitted Constellation to withhold the ECM1 retainage pending resolution of the persistent lighting issues at FCC Coleman. The Court will therefore enter judgment for Constellation on LRI's claims for breach of the Subcontract (Count II), quantum meruit (Count IV), and unjust enrichment (Count V).

While LRI cannot recover for its affirmative claims for retainage, Constellation stipulated at trial that LRI is entitled to the amount of ECM1 retainage as a setoff against any amount awarded to Constellation. ECF 126 at 156:15-159:5. Thus, the Court will reduce Constellation's award by the agreed upon retainage amount of $177,635.65.[5]

### c. LRI's Miller Act Claim Against Liberty Mutual

LRI has asserted a claim against Constellation's surety, Liberty Mutual, under the Miller Act, 40 U.S.C. § 3131. "Under the Miller Act, before any federal contract with a value exceeding $100,000 can be awarded for the construction or improvement of a public building, the putative contractor must furnish to the Government (1) a performance bond for the protection of the Government and (2) a payment bond for the protection of 'all persons supplying labor and material in carrying out the work provided for in the contract,' e.g., subcontractors." *United States v. Hartford Accident & Indem. Co.*, 168 F. Supp. 3d 824, 831 (D. Md. 2016) (quoting 40 U.S.C. § 3131(b)). The Act also authorizes a subcontractor who carries out work pursuant to such a federal contract to "bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought." 40 U.S.C. § 3133(b)(1). "[I]it is a cardinal rule of the surety/principal relationship that a surety occupies the shoes of its principal," and therefore "in general, the surety's liability on the payment bond is defined by the liability of the underlying contract." *Hartford Accident & Indem. Co.*, 168 F. Supp. at 831 (quotations omitted). Indeed, LRI acknowledged in its post-trial memorandum that its Miller Act claim "stands and falls on the strength of LRI's claim against [Constellation]." ECF 129 at 29. As explained above, Constellation is not liable to LRI on

---

[5] LRI is not entitled to pre- or postjudgment interest on the ECM1 retainage amount, to the extent that it seeks such interest. *See* ECF 129 at 19, 132 at 2. That is because a setoff is "a diminution or a complete counterbalancing of the adversary's claim," as opposed to "an affirmative judgment." *Imbesi v. Carpenter Realty Corp.*, 744 A.2d 549, 552 (Md. 2000).

the latter's affirmative claims for retainage. Because Constellation is not liable, Liberty Mutual

cannot be held liable under the Miller Act. Judgment will therefore be entered for Liberty Mutual

on Count I of LRI's Complaint.

### d. Prejudgment Interest

Constellation also seeks prejudgment interest on its losses suffered in connection with the

Holophane and emergency lighting costs. "When reviewing state-law claims based on

supplemental jurisdiction, the award of prejudgment interest rests on state law." *Cannon v. Peck*,

36 F.4th 547, 577 (4th Cir. 2022) (quotations omitted). As recently explained by the then-Court of

Appeals of Maryland, the award of prejudgment interest in Maryland is governed by three rules:

> First, prejudgment interest is allowed as a matter of right where the obligation to
> pay and the amount due had become certain, definite, and liquidated by a specific
> date prior to judgment so that the effect of the debtor's withholding payment was
> to deprive the creditor of the use of a fixed amount as of a known date. Second,
> prejudgment interest is not allowed in tort cases where the recovery is for bodily
> harm, emotional distress, or similar intangible elements of damage not easily
> susceptible of precise measurement . . . . Third, prejudgment interest is left to the
> discretion of the trier of fact . . . when a contract case falls in between these two
> ends of the spectrum . . . . This third rule serves as the general rule for prejudgment
> interest and encompasses the vast majority of contract cases.

*Nationwide Prop. & Cas. Ins. Co. v. Selective Way Ins. Co.*, 248 A.3d 1044, 1052-53 (Md. 2021)

(quotations and citations omitted). Thus, "pre-judgment interest as a matter of right is the exception

rather than the rule." *Ver Brycke v. Ver Brycke*, 843 A.2d 758, 777 (2004). "[S]uch interest is

typically awarded only in . . . breach of contract actions such as those involving 'contracts in

writing to pay money on a day certain,' 'actions under contracts providing for the payment of

interest' or 'cases upon sums payable as rent.'" *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Kirson*,

525 F. Supp. 3d 628, 637 (D. Md. 2021) (quoting *I.W. Berman Prop. v. Porter Bros., Inc.*, 276

Md. 1, 344 A.2d 65, 75 (1975)). When prejudgment interest is mandatory, such interest accrues at

the Maryland legal rate of six percent per annum "from the date where the obligation to pay and

the amount due were both certain." *Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 311 (4th Cir. 2020); *see also* Md. Const. Art. III § 57 (establishing the legal rate of interest in Maryland).

Constellation's claim for prejudgment interest is not based on a provision to "pay money on a day certain." *Kirson*, 525 F. Supp. 3d 628, 637. Rather, Constellation argues that (1) LRI's obligation to pay damages arose as a result of LRI's refusal, in July, 2019, to cure Constellation's notification of breach, and (2) that the amount owed was fixed by December 31, 2019, at which point Constellation had paid for its emergency lighting expenses and entered into its contract with Aelux to purchase and install the Holophane fixtures. But even if the *amount* of LRI's liability was ascertainable by that date, the Subcontract did not specify *when* LRI was required to pay the costs incurred by Constellation after LRI walked off the job. *See Bazan v. Preferred Gen. Contracting, Inc.*, No. 532, Sept. Term, 2020, 2022 WL 17750247, at *3 (Md. Ct. Spec. App. Dec. 19, 2022) ("[I]n the absence of a specific date on which payment was due, [plaintiffs] were not entitled to prejudgment interest . . . as a matter of right."); *see also Metromont Corp. v. Allan Myers, L.P.*, No. CV DKC 18-3928, 2021 WL 3367772, at *13 (D. Md. Aug. 3, 2021) ("Courts must determine whether a contract case [requires mandatory interest] based on their level of certainty as to the existence, amount, and due date of an obligation to pay."). Given the presumption against mandatory prejudgment interest, this Court concludes that this case falls within "the vast majority of contract cases" under Maryland law for which prejudgment interest is left to the factfinder's discretion. *Nationwide Prop. & Cas. Ins. Co.*, 248 A.3d at 1053. Furthermore, Constellation has failed to explain why discretionary prejudgment interest is warranted here. Rather, this Court concludes that the award discussed above is sufficient to compensate Constellation for its ECM1-related losses. This Court therefore declines to exercise its discretion to award Constellation

prejudgment interest. Postjudgment interest, however, is available in accordance with 28 U.S.C. § 1961.

### III.      Conclusion

For the foregoing reasons, this Court finds that Constellation has met its burden in proving that LRI breached its warranty obligations under the Subcontract. Judgment will therefore be entered in favor of Constellation on its ECM1-related breach of contract counterclaim in the amount of $1,343,479.11, which includes the amounts paid by Constellation for the replacement and emergency lighting costs, less the retainage amount owed to LRI. Judgment will also be entered in favor of Liberty Mutual on LRI's Miller Act claim (Count I), and in favor of Constellation on LRI's claims for breach of subcontract (Count II), quantum meruit (Count IV), and unjust enrichment (Count V). LRI's motion for leave to amend its answer to assert a statute of limitations defense, ECF 133, will be denied. A separate order follows.


Dated: March 1, 2023                                  _____/s/_____
                                                       Stephanie A. Gallagher
                                                       United States District Judge

30